**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
**Case No. 8:22-CV-01014-MSS-SPF**

| | |
|---|---|
| BRITTNEY GIBSON, individually and as a representative of the Classes,<br><br>Plaintiff,<br><br>vs.<br><br>CERTIFIED CREDIT REPORTING, INC., and CERTIFIED CREDIT REPORTING OF FLORIDA, INC.,<br><br>Defendants. | **FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Brittney Gibson ("Plaintiff" or "Ms. Gibson"), who is a living, breathing consumer, brings this Class Action Complaint against Certified Credit Reporting, Inc. ("CCR") and Certified Credit Reporting of Florida, Inc. ("CCRF") (collectively, "Defendants"), on behalf of herself and the Classes set forth below:

## INTRODUCTION

1.      This is a class action for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, against a consumer reporting agency that falsely reports that consumers are deceased, even when it has clear evidence in its possession that the individuals in question are very much alive.

2.      This reporting has devastating consequences for individuals who are misreported as dead.  Credit bureaus will not issue credit scores on deceased consumers, meaning that someone who is being falsely reported as deceased is

unable to obtain credit.  This problem is especially consequential for consumers who are seeking to obtain mortgage financing.

3.     In addition to falsely reporting consumers as deceased, Defendants also falsely report that individuals' debts are higher than they are, to such individuals' detriment.

4.     Pursuant to the FCRA, Defendants have an obligation to use reasonable procedures to ensure maximum possible accuracy in their reports. Defendants failed to employ *any* procedures to ensure the accuracy of their deceased reporting. Defendants' procedures for reporting aggregate debts were also unreasonable, ignoring clearly duplicative accounts and treating them as separate debts.

5.     Plaintiff sues to achieve redress on behalf of herself and the proposed Classes.

## **BACKGROUND ON CREDIT REPORTING INDUSTRY**

6.     Companies that accumulate and sell data concerning individuals' credit histories and other personal information are known as consumer reporting agencies ("CRAs").

7.     The "Big Three" major national CRAs are Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union, LLC ("Trans Union").

8.     The Big Three sell credit information to paying subscribers (i.e., lenders, retailers, landlords, potential employers, and others), concerning

individuals who may be applying for a mortgage, other credit, housing, or employment.

9.     The Big Three also sell credit information to "reseller" CRAs, such as Defendants, who assemble and merge the credit information obtained from each of the Big Three into a three-bureau credit report, also known as a "tri-merge" or "merged infile" credit report.  Defendants combine this information, adds their own summary of the three bureaus' data, and then sell the completed report to mortgage lenders throughout the country.

10.     In the parlance of the FCRA, both the information sold by the Big Three to the resellers and the information sold by resellers to the resellers' customers constitute "consumer reports."  15 U.S.C. § 1681a(d).

11.     Not all creditors report debt to all three of the Big Three, but many creditors report to more than one bureau, and some creditors report to all three. Given the nature of a tri-merge, Defendants know that some, but not all, of the data they receive about consumers' debts will be duplicated among the Big Three.

12.     Lenders use tri-merge reports because they want to review credit information from all of the Big Three credit bureaus to ensure that they do not make loans based on an incomplete picture of the credit applicant's financial position.

13.     Lenders who use tri-merge reports rely on credit scores generated by running standard algorithms against *each* of the Big Three's credit files.  Tri-merge reports often contain three credit scores (one for each bureau), with the difference

in scores being accounted for by variations among each bureau's data (as well as differences in the scoring algorithm).

14.     Since 1970, when Congress enacted the FCRA, federal law has required all CRAs, including resellers like Defendants, to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile, assemble, merge, and sell about individual consumers.  15 U.S.C. § 1681e(b).

15.     One of the primary purposes in requiring CRAs and resellers to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

16.     The preservation of consumers' good names and reputations is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * ***

> *[A]s Shakespeare said, the loss of one's good name is beyond price*
> *and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) (quoting 116 Cong. Rec. 36570 (1970)).

17.     In light of these findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy."  *See* 15 U.S.C. § 1681(a)(4).

18.     This class action seeks statutory and punitive damages, costs and attorneys' fees for Plaintiff and the Classes against Defendants for their willful violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, by inaccurately reporting that Plaintiff and members of the Classes were deceased, and/or owed more debt than they actually did.

## **THE PARTIES**

19.     Plaintiff Brittney Gibson ("Plaintiff" or "Ms. Gibson") is a natural person who lives in Winter Haven, Florida and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

20.     Defendant Certified Credit Reporting, Inc. ("CCR") is a California corporation, with its headquarters and its principal place of business in Ontario, California, that does business nationwide.

21.     Defendant Certified Credit Reporting of Florida, Inc. ("CCRF") is a Florida corporation, with its headquarters and its principal place of business in St. Cloud, Florida, that does business nationwide.

22.     Both Defendants are "consumer reporting agencies" as defined in 15 U.S.C. § 1681a(f).   Defendants regularly engage in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

23.     Defendants share common ownership and are corporate siblings.   As is further alleged below, Defendants' operations are so intertwined that they are legal alter egos of one another and are each fully liable for the acts and omissions of the other.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over Plaintiff's claims pursuant to 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

25.     Venue is proper in this Court because Defendant CCRF resides in this County and a substantial part of the events or omissions giving rise to the claims occurred in this County.

26.     In connection with the transfer of this matter from California, Defendant CCR agreed to waive any objections it had to personal jurisdiction in this Court.

## DEFENDANTS' UNREASONABLE PROCEDURES

### Defendants' Process of Assembling and Merging Consumers' Credit Information into Tri-Merge Credit Reports

27.    The Big Three national credit bureaus (Equifax, Experian, and Trans Union) regularly receive information from various sources around the country, including banks, credit unions, automobile dealers, student loan providers, public information vendors, the Social Security Administration, and others.   These sources are known as "furnishers" within the credit reporting industry and under the FCRA.  *See* 12 CFR § 1022.41.

28.    The Big Three collect information from thousands of furnishers and distribute that information to their many subscribers, including Defendants.

29.    Defendants' customers, in turn, use that information to make decisions as to whether to extend credit to a particular consumer and for other purposes permitted under the FCRA.

30.    The process by which the Big Three receive, sort, and store information is largely electronic.

31.    The Big Three take the credit, public record, and other information reported by furnishers and use it to create consumer credit files.

32.    The Big Three maintain credit files on more than 200 million consumers.

33.     When Defendants request credit information from the Big Three for a particular consumer, the Big Three send raw credit data to Defendants electronically.

34.     After receiving the raw credit data from the Big Three for a particular consumer, Defendants assemble, merge, normalize, and summarize that data into a tri-merge credit report.

35.     As far as Defendants are concerned, accuracy means outputting the same credit data that they received from the Big Three without alteration.

36.     Defendants do nothing to ensure that the credit information they receive is, in fact, accurate.

37.     Defendants do not analyze the accuracy of the underlying credit data they receive from the Big Three in any way, but merely accept it at face value.

38.     Defendants do not take any action to determine if the information they receive from one of the Big Three is facially incompatible with information received from another of the Big Three.

39.     Defendants do not take sufficient action to determine if the information they receive from one of the Big Three is duplicative of information received from another of the Big Three.  While Defendants' reports indicate which bureau(s) reported specific tradeline data, the process Defendants use is so rudimentary that it often fails to flag accounts reported by more than one bureau as the same account, even when the account numbers, balances, and creditors are

all the same, resulting in a single account being reported as multiple debts, inflating the total outstanding debt which Defendants report.

40. Defendants do not employ reasonable procedures to assure the maximum possible accuracy of the credit information they include in the tri-merge credit reports they sell to mortgage lenders throughout the country.

**Defendants' Practices Concerning
the Sale of Reports on the "Deceased"**

41. Defendants sell thousands of consumer reports, also known as tri-merge credit reports, each year, and also sell credit scores.

42. Defendants sell tri-merge credit reports and credit scores to various markets, including but not limited to the mortgage financing and lending industry.

43. Pursuant to 15 U.S.C. § 1681e(b), Defendants are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

44. Defendants routinely sell credit reports for *living* consumers with active credit histories, which include a notation indicating that the *living* consumer is "deceased" and therefore does not have a credit score.

45. Defendants do not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" notation on that consumer's tri-merge credit report.

46. Defendants do not employ any procedures *at all* to assure that a consumer with a "deceased" notation on their tri-merge credit report is, in fact,

actually deceased before including the "deceased" notation on that consumer's report and selling that report for profit.

47.   Even in instances where other data on the face of the consumer's tri-merge report indicates that the consumer is alive, such as a current and active credit history, Defendants employ no procedures to assure that a consumer with a "deceased" notation on their report is, in fact, actually deceased before including the "deceased" notation in that consumer's file.

48.   That is, when Defendants receive information from one of the Big Three that a consumer is deceased, and information from another of the Big Three that is incompatible with that information – such as an active credit score (indicating the other bureau does not believe the consumer is deceased), and open accounts with a very recent payment history – Defendants make no investigation.

49.   Once a "deceased" notation is included in a consumer's report from one of the Big Three, Defendants cannot provide a credit score for that consumer for that member of the Big Three.

50.   Instead, when Defendants sell a report with a "deceased" notation to a third party, they report that consumer's credit score as "N/A," for that member of the Big Three, while simultaneously providing scores based on the data from the other of the Big Three.

51.   Defendants know that third party credit issuers require a credit score from *all* of the Big Three in order to process a given credit application.

52.     Defendants also know that consumers without credit scores from *all* of the Big Three are unable to secure credit from most credit issuers.

53.     Defendants also know that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

54.     Defendants have been put on notice through consumer disputes that living, breathing consumers are turned down for credit specifically because Defendants are reporting them as "deceased" and without a credit score.

55.     Nevertheless, Defendants have an automated process in place that accepts all credit data received from the Big Three as accurate and employs no procedures to assure that a consumer marked as "deceased" by at least one bureau on their tri-merge credit report is, in fact, deceased.

56.     Defendants have no independent procedures to change an erroneous deceased status on their own and merely parrot the credit information received from the Big Three.

57.     Defendants know their reporting regarding deceased consumers is often erroneous.  In fact, they include the following alert on reports containing the deceased notation:

0 - ONE OR MORE RECORDS ON THE CONSUMER'S CREDIT FILE INCLUDES A REMARK THAT THE CONSUMER IS DECEASED. THIS DOES NOT NECESSARILY MEAN THAT THE SUBJECT OF THE CREDIT REPORT IS DECEASED. FOR INSTANCE, ANOTHER ACCOUNT HOLDER OTHER THAN THE BORROWER MAY HAVE BEEN REPORTED DECEASED. NO ADVERSE ACTION MAY BE TAKEN BASED IN WHOLE OR IN PART OF THIS STATEMENT.

58.     It is nonsensical and in direct violation of the FCRA's mandate of maximum possible accuracy to report that an individual is deceased while

simultaneously stating that "this does not necessarily mean that the subject of the credit report is deceased."  This is particularly so when the only alternative explanation offered by Defendants—that it may be "another account holder" who is deceased – is wholly inconsistent with Defendants' refusal to provide a credit score on the consumer who is the subject of the report.

59.     Defendants cannot disclaim their way out of their legal obligation to issue reports with maximum possible accuracy.  Reporting information that they know or should know is inaccurate, alongside a disclaimer acknowledging the data may be inaccurate, violates the FCRA.

### Defendants' Practices Concerning the "Trade Summary" Section of Their Reports

60.     Because Defendants' reports include data from each of the Big Three, they often receive the same information two or three times.  For example, if a consumer is making payments on an auto loan, and the lender reports that debt and those payments to each of the Big Three, Defendants would receive the same data about that loan three times in the process of assembling a tri-merge credit report.

61.     Defendants make little effort to de-duplicate the data they receive, instead reporting each record of a debt received from each of the Big Three as if it is a separate account, along with a notation indicating which bureau provided the underlying data.  Defendants sometimes identify an account as being reported by more than one bureau, but often fail to identify as duplicates accounts that are

obviously redundant, such as accounts from the same creditor, with the same account number, and with the same balance and payment history.

62.    Compounding this issue, Defendants also include a section on their reports entitled "Trade Summary" which consists of a table purporting to show the total debts a consumer has in each of a number of categories (mortgage, auto, etc.), as well as a listing of total debt for that consumer.  In calculating those totals, Defendants do not account for the fact that they receive duplicate data from each of the Big Three, leading some debts to be double or triple counted in Defendants' totals.  This causes the report to overstate the amount of debt the consumer carries.

63.    Defendants compound this error by also reporting a debt to credit ratio that overstates the consumer's debts.

64.    This misreporting harms consumers, as it makes them out to be more indebted than they actually are, and thus makes them appear less creditworthy to the mortgage lenders who receive and evaluate Defendants' consumer reports.

**FACTUAL ALLEGATIONS RELATING TO PLAINTIFF**

65.    In August 2021, newly separated from her husband and looking to purchase a home for herself and her children, Plaintiff sought pre-approval for a mortgage loan from non-party The Mortgage Firm, Inc.

66.    In furtherance of that process, Mortgage Firm requested a tri-merge credit report about Plaintiff from Defendants, which Defendants delivered on August 19, 2021.

67.     Defendants' report included data and credit scores from Experian and Trans Union, but only the following notation regarding Equifax:



68.     Defendants included this notation on the report, taking no steps to verify it, despite receiving credit scores from Experian and TransUnion, as well as other information from each of the Big Three indicating that Plaintiff had active accounts with recent activity, recently reported addresses, and recent employment activity.

69.     Defendants' report also included, in the "Trade Summary" section, an indication that Plaintiff had $26,572 in debt.  This reporting was incorrect.

70.     $26,572 is the total of the balances listed elsewhere in Defendants' report.

71.     However, Defendants' report contains obvious duplicate balances. For example, a debt of $1,918 is reported twice (once as reported by Equifax, and once as reported by Experian), despite listing the same amount, the same date opened, account numbers both ending in 2559, and the same creditor.

72.     By totaling all of these debts up without accounting for duplication in the "Trade Summary" section of the report, Defendants overstated Plaintiff's debt by at least $1,918.

73.     Totaling up duplicative debt without accounting for the duplication also caused Defendants to overstate Plaintiff's debt to credit ratio, which Defendants erroneously reported as 124%.

74.     Plaintiff's request for pre-approval was not successful, and Plaintiff was forced to abandon the home purchase process, remaining in rental housing and housing belonging to family members.

75.     As a result of Defendants' conduct, Plaintiff has suffered concrete financial and pecuniary harm arising from monetary losses relating to credit denials, loss of use of funds, loss of credit and loan opportunities, out-of-pocket expenses, and other related costs.

76.     As a result of Defendants' conduct, Plaintiff has suffered concrete harm in the form of financial and dignitary harm arising from the injury to credit rating and reputation.

<u>**DEFENDANTS ARE ALTER EGOS OF EACH OTHER**</u>

77.     The consumer report issued on Plaintiff, on its face, indicates that it was issued by CCR:



78.     Plaintiff's file from Equifax shows that CCR purchased information about her from Equifax for the purpose of issuing a report to The Mortgage Firm:

**Hard Inquiries**

Inquiries that may impact your credit rating/score
These are inquiries made by companies with whom you have applied for a loan or credit. They may remain on your r

| Date | Company | Request Originator |
|---|---|---|
| Aug 19, 2021 | CERTIFIED CREDIT | THE MORTGAGE FIRM I |
| | 3281 EAST GUASTI ROAD SUITE 290 ONTARIO, CA  91761 | |
| | 1-800-769-7615 | |

79.     Despite CCR's name appearing on several documents associated with Plaintiff's report, including the report itself, CCR and CCRF both insist that Plaintiff's report was issued only by CCRF.

80.     The fact that CCR's name appears on the report and other documents associated with a report issued by CCRF is evidence of disregard of corporate formalities, lack of segregation of corporate records, use of one company as a mere shell for another, and possible comingling of corporate funds, all of which support the imposition of the alter ego liability on both entities.

81.     CCR and CCRF have a number of joint employees, including but not limited to a shared Senior Vice President for Operations & Compliance.  (Stratton Decl., ECF No 13-1 ¶¶ 1, 3.)

82.     CCR and CCRF utilize shared client agreements.  (*Id.* ¶ 3.)

83.     CCR and CCRF utilize shared computer platforms, including the MeridianLink platform by which both CCR and CCRF generate consumer reports. (*Id.* ¶¶ 3, 6.)

84.     CCR and CCRF have shared employees, shared computer platforms and shared client agreements pursuant to a so called "shared services agreement." (*Id.* ¶ 3.)

85.     This "shared services agreement" between CCR and CCRF, however, is not a written document.

86.     Rather, the "shared services agreement" between CCR and CCRF is an informal, unwritten understanding with terms that are flexible and change over time.

87.     All consumer reports generated by CCR and CCRF have the same overall appearance, and all list CCR's name, corporate logo and contact information.  None list CCRF's name, corporate logo and contact information.

88.     The only purported way to distinguish between a "CCR report" and a "CCRF report" is to examine the "account number" listed on the report: CCRF reports purportedly have an account number beginning with the number 7.  (*Id.* ¶ 6.)

89.     The fact that CCRF reports have an account number beginning with 7 is not publicly known; any consumer looking at their CCR or CCRF report would assume it came from CCR, because CCR's name, corporate logo and contact information are listed on the face of the report.

90.     Discovery will reveal further support for the imposition of the alter ego doctrine, including identical ownership, comingling of responsibilities for various aspects of FCRA compliance, inadequate capitalization, disregard of

corporate formalities, lack of segregation of corporate records and corporate funds, and overlapping and/or identical directors and officers.

## CLASS ACTION ALLEGATIONS

91.  <u>The Not Deceased Class</u>: Plaintiff brings Count I on behalf of herself individually and on behalf of a class, defined as follows:

> All natural persons who were the subject: (1) of a consumer report furnished by the Defendants to a third party within the two years preceding initiation of this action; (2) where the Defendants' consumer report contained a notation that the consumer was deceased from at least one of: Experian, Equifax or Trans Union; (3) where at least one other of Experian, Equifax or Trans Union did not contain a deceased notation; and, (4) where the consumer was not deceased at the time the report was issued.

92.  <u>The Trade Summary Class</u>: Plaintiff brings Count II on behalf of herself individually and on behalf of a class, defined as follows:

> All natural persons who were the subject: (1) of a consumer report furnished by the Defendants to a third party within the two years preceding initiation of this action; and, (2) where the Defendants' consumer report contained, in the Trade Summary section, a debt total arrived at by counting the same debt more than once.

93.  Class certification is appropriate under Fed. R. Civ. P. 23(a).

94.  <u>Numerosity</u>: The Classes are so numerous that joinder of the claims of all class members is impractical.  Membership in the Classes can be ascertained through Defendants' records.

95.  <u>Existence and Predominance of Common Questions of Law and Fact</u>: Common questions of law and fact exist as to all class members.  These questions predominate over the questions affecting only individual members.  These

common legal and factual questions include, among other things: (a) whether Defendants blindly include whatever information they obtain from the Big Three into their reports without any procedure to assure the accuracy or completeness of the underlying data; (b) whether Defendants blindly calculate debt totals without regard to duplication; (c) whether this conduct violated the FCRA; and, (d) whether the violations were willful, reckless, knowing, or intentionally committed in conscious disregard of the Plaintiff's and class members' rights.

96.   <u>Typicality</u>: Plaintiff's claims are typical of the claims of each class member and all claims are based on the same facts and legal theories.  Plaintiff, as every class member, alleges violations of the same FCRA provision, 15 U.S.C. §1681e(b).  The claims challenge the Defendants' consumer reporting procedures and do not depend on any individualized facts.  For purposes of class certification, Plaintiff seeks only statutory and punitive damages.  Such damages are appropriate in circumstances like this one where injuries are particularized and concrete, but difficult to quantify, rendering the recovery of class statutory damages ideal and appropriate.

97.   <u>Adequacy</u>: Plaintiff will fairly and adequately protect the Classes' interests.  Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions.  Neither Plaintiff nor her counsel have any interests that might cause them not to vigorously pursue this action.  Plaintiff is aware of her responsibilities to the Classes and has accepted such responsibilities.

98.     Class certification is appropriate under Fed. R. Civ. P. 23(b) because, *inter alia*, as alleged above, the questions of law or fact common to the class members predominate over any questions affecting an individual member.  Each of the common facts and legal questions in the case overwhelm the more modest individual issues.  The statutory and punitive damages sought by each member are such that the individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendants' conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Consumer claims generally are ideal for class treatment as they involve many consumers who are unable to afford and bring such claims individually.  Further, most consumers affected by Defendants' conduct are likely unaware of their rights under the law.  Individual litigation of the uniform issues in this case would be a waste of judicial resources.  The issues at the core of this case are class-wide and should be resolved at one time.

99.     Plaintiff intends to send notice to all members of the Classes to the extent required by Fed. R. Civ. P. 23.  The names and addresses of the class members are available from Defendants' records.

## COUNT I

**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to**
**Assure Maximum Possible Accuracy**
**(On behalf of Plaintiff individually**
**and on behalf of the Not Deceased Class)**

100.   Plaintiff re-alleges and incorporates the allegations set forth above as if fully stated herein.

101.   The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

102.   Defendants prepared patently false consumer reports concerning Plaintiff and Not Deceased Class members, incorrectly indicating that they were deceased.

103.   Defendants assembled, merged, and resold patently false consumer reports concerning Plaintiff and Not Deceased Class members, incorrectly indicating that they were deceased.

104.   Despite actual and implied knowledge that Plaintiff and the Not Deceased Class members were not dead, Defendants readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff and Not Deceased Class members and their creditworthiness.

105.   Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to ensure maximum possible accuracy in the preparation of the credit reports and credit files they published and maintained concerning Plaintiff and Not Deceased Class members.

106.   As a result of Defendants' conduct, Plaintiff and the Not Deceased Class suffered concrete harm including but not limited to financial harm, harm to credit opportunities and reputational harm.

107.   Defendants' violations were willful, rendering them liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

108.   Defendants' conduct was willful because it was carried out in knowing or reckless disregard for consumers' rights under the FCRA.  Defendants' conduct was intentionally accomplished through their intended procedures; these procedures have continued despite the fact that other consumer reporting agencies have been subject to court decisions and consumer complaints critical of similar conduct; and, Defendants will continue to engage in this conduct because they believe there is greater economic value in selling over-inclusive consumer reports with facial inconsistencies than engaging in the due diligence that would result in producing accurate reports.

109.   Plaintiff and Not Deceased Class members are entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II

**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures**
**to Assure Maximum Possible Accuracy**
**(On behalf of Plaintiff individually and**
**on behalf of the Trade Summary Class)**

110.    Plaintiff re-alleges and incorporates the allegations set forth above as if fully stated herein.

111.    The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

112.    Defendants assembled, merged, and resold patently false consumer reports concerning Plaintiff and Trade Summary Class members, incorrectly indicating they owed more than they did.

113.    Despite facts apparent from the face of the reports making clear that Defendants were double or triple counting debts, Defendants readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff and Trade Summary Class members, and their creditworthiness.

114.    Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to ensure maximum possible accuracy in the preparation of the credit reports and credit files they published and maintained concerning Plaintiff and Trade Summary Class members.

115.    As a result of Defendants' conduct, Plaintiff and Trade Summary Class members suffered concrete harm including but not limited to financial harm, harm to credit opportunities and reputational harm.

116.    Defendants' violations were willful, rendering them liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

117.    Defendants' conduct was willful because it was carried out in knowing or reckless disregard for consumers' rights under the FCRA. Defendants' conduct was intentionally accomplished through their intended procedures; these procedures have continued despite the fact that other consumer reporting agencies have been subject to court decisions and consumer complaints critical of similar conduct; and, Defendants will continue to engage in this conduct because they believe there is greater economic value in selling over-inclusive consumer reports with facial inconsistencies than engaging in the due diligence that would result in producing accurate reports.

118.    Duplicative reporting has long been seen as a procedure which is detrimental to consumers and in violation of 15 U.S.C. § 1681e(b). *See, e.g., Smith v. HireRight Sols., Inc.*, 711 F. Supp. 2d 426, 436 (E.D. Pa. 2010). Defendants' production of reports containing duplicative information, and drawing conclusions based on duplicative information, is a willful violation of the FCRA.

119.    Plaintiff and Trade Summary Class members are entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Classes, seek the

following relief:

a)  Determining that this action may proceed as a class action;

b)  Designating Plaintiff as the representative for the Classes;

c)  Designating Plaintiff's Counsel as counsel for the Classes;

d)  Issuing notice to the Classes at Defendants' expense;

e)  Declaring that Defendants committed multiple, separate violations of the FCRA;

f)  Declaring that Defendants acted willfully and in deliberate or reckless disregard of the rights of Plaintiff and the Classes under the FCRA;

g)  Awarding statutory damages as provided by the FCRA;

h)  Awarding punitive damages as provided by the FCRA;

i)  Awarding reasonable attorneys' fees and costs and expenses, as provided by the FCRA; and,

j)  Granting further relief, in law or equity, as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff and the Classes demand a trial by jury.


Dated: May 10, 2022                    Respectfully Submitted,

                                       /s/Joseph C. Hashmall
                                       Joseph C. Hashmall*
                                       BERGER MONTAGUE PC
                                       1229 Tyler Street NE, Suite 205
                                       Minneapolis, MN 55413
                                       T. 612.594.5999

F. 612.584.4470
jhashmall@bm.net
*pro hac vice*

Philip R. Goldberg, SBN 298855
Seraph Legal, P.A.
1614 N. 19th Street
Tampa, FL 33605
T. 813.567.1230
F. 855.500.0705
pgoldberg@seraphlegal.com

ATTORNEYS FOR PLAINTIFF